NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0811n.06

No. 08-1320

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Dec 18, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| EDRES MONTGOMERY, | ) | O P I N I O N |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:     MERRITT, CLAY, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.**  Defendant-Appellant Edres "E-Way" Montgomery appeals from his convictions for conspiring to distribute cocaine and cocaine base between late 1997 and November of 2004, for distributing cocaine base on March 22, 2004, and for two counts of witness tampering.  Because he was convicted of his third felony drug offense, Montgomery was sentenced to a mandatory term of life imprisonment under 18 U.S.C. § 841.   For the reasons set forth below, we **AFFIRM** Montgomery's convictions and sentence.

### I.  BACKGROUND

Evidence showed that while Defendant was a cellmate with Magarito Casas between 1992-1993, they agreed that they should "hook up" when they got out of prison.  (Trial Tr., Vol. 2, 80-84.)  After Montgomery and Casas were released, they formed an agreement in which Montgomery

provided Casas with cocaine powder and marijuana. Casas would then take this cocaine powder, which he bought from Montgomery in quantities ranging from one ounce to one kilogram, break it down, and resell it to various customers in the Saginaw, MI area, including Rubuen Luna and Lee Wiedyk. The agreement between Montgomery and Casas continued from late 1997 through November of 2004 during which Casas purchased an estimated ten kilograms or more of cocaine powder from Montgomery. At some point after 2000, Montgomery began to sell crack cocaine (cocaine base) to Casas.

In the summer of 2003, a former drug dealer named Drew Dobschensky offered to help the DEA investigate drug trafficking in Saginaw. The DEA paid Dobschensky to make several undercover purchases of crack cocaine from Rubuen Luna, a local drug dealer. One purchase occurred on January 15, 2004 and a second on January 21, 2004. This investigation led law enforcement agents to investigate Casas, who was supplying Luna with crack cocaine.

In the first transaction on January 15th, Casas testified that he contacted Montgomery to find crack cocaine for Luna. Montgomery agreed to supply the crack cocaine, and Casas instructed Luna to come pick the crack cocaine up at his apartment. When Luna arrived at Casas' apartment, Montgomery was sitting in the living room. Casas led Luna into a bedroom, closed the door, conducted the transaction, and left. After selling the crack cocaine to Dobschensky, Luna returned and gave some of the proceeds to Casas in a bedroom with the door closed; Montgomery remained in the living room.

In the second transaction on January 21st, Casas picked the crack cocaine up from Montgomery and delivered it by himself to Luna. After selling the crack cocaine to Dobschensky,

Luna took the cash to Casas' apartment, where he again walked past Montgomery in the living room, went into the bedroom with Casas, and then gave him the cash while Montgomery remained in the living room. Luna did not have any contact with Montgomery while at Casas' apartment during the January 15th or the January 21st transactions.

After conducting the two January crack cocaine transactions, law enforcement agents attempted to use Dobschensky to purchase crack cocaine from Casas directly. These efforts were unsuccessful. However, around this time, DEA agent Halverson was introduced to Lee Wiedyk, who had been arrested by state police and who knew Casas and owed him money. The DEA used Wiedyk to make controlled purchases directly from Casas. One of these purchases took place on March 4, 2004. Wiedyk testified that, during this transaction, a man introduced to him as Montgomery got into the back of Wiedyk's car, and gave Casas a bag of crack cocaine, which Casas then gave to Wiedyk. Wiedyk handed the money to Casas, and Casas handed the remaining money to Montgomery.

A second purchase took place on March 22, 2004, when the DEA monitored Wiedyk after he arranged to buy a half ounce of crack from Casas in an Applebee's restaurant in Saginaw. Initially, law enforcement agents followed Casas to 3035 Harold Street, which was identified as Montgomery's residence, and watched Casas pick up a black male, who was around Montgomery's age and wearing a yellow jogging outfit. Casas then drove his white Durango to Applebee's, conducted the drug transaction with Wiedyk, and left after less then a minute. The black male did not actually get out of the car at Applebee's; instead, Casas got out of the car and gave Wiedyk the drugs. Wiedyk could not identify the person in the car, and was not sure that it was the same person

present at the first buy. After the transaction, Casas and the black male returned to 3035 Harold Street.

Following this investigation, Casas and Montgomery were both arrested and incarcerated in Saginaw County Jail, where they were lodged in different cell blocks. While there Montgomery, without any prompting, sent Casas several letters or "kites" urging Casas to change his story or refuse to testify (Casas had agreed to testify against Montgomery).[1] Montgomery sent Casas two more letters after Casas moved to Clare County Jail. Casas saved the kites and the letters that Montgomery sent him and eventually turned them over to the authorities.

Montgomery was indicted in two separate cases: Case No. 04-20046 (the drug conspiracy and distribution charges) and Case No. 06-20544 (the witness tampering charges).[2] In Case No. 04-20046, the jury found Montgomery guilty of Count 1 (participating in a conspiracy to possess with the intent to distribute and to distribute five kilograms or more of a substance containing cocaine powder or fifty grams or more of cocaine base) and guilty of Count 8 (distributing and aiding and abetting Casas in the distribution of five grams or more of cocaine base to Wiedyk on March 22nd). In Case No. 06-20544 (the witness tampering charges), the jury found Montgomery guilty of both Count 1 (attempting between October 7, 2005 and August 20, 2006 to influence and prevent the

---

[1]Among other things, Casas testified to Montgomery's involvement in the conspiracy between 1997 and 2004 and in the drug transactions on January 15, 2004, January 21, 2004, March 4, 2004, and March 22, 2004.

[2]The witness tampering charges arose after the grand jury that charged Montogmery with drug conspiracy and distribution disbanded. The district court consolidated the two indictments.

testimony of Casas in an official proceeding) and Count 2 (attempting between April 20, 2006 and September 12, 2006 to influence and prevent the testimony of Casas in an official proceeding).

Because of Montgomery's prior convictions, a mandatory life sentence was imposed after Montgomery's drug conspiracy conviction in Count 1 from Case No. 04-20046. Montgomery was also sentenced to a concurrent term of 360 months after his conviction on Count 8 from Case No. 04-20046. The district court imposed concurrent terms of 120 months with respect to Counts 1 and 2 from Case No. 06-20544.

## IV. ANALYSIS

On appeal, Montgomery raises numerous challenges to his convictions and sentence: (1) the lack of a pre-trial hearing on the admissibility of the co-conspirators' statements; (2) the denial of Montgomery's motion to dismiss Count 1 of the second superceding indictment; (3) the district court's consolidation of the drug and witness tampering indictments; (4) the district court's denial of relief under Rules 29 and 33 of the Federal Rules of Criminal Procedure; (5) the district court's denial of Montgomery's motion for mistrial based on prosecutorial misconduct; and (6) that Montgomery's mandatory life sentence for his third felony drug offense was cruel and unusual punishment.

### 1.    *Admissibility of the co-conspirators' statements*

It was not an abuse of discretion for the district court to deny Montgomery's motion for a pre-trial hearing on the admissibility of the co-conspirators' statements. A trial judge has "considerable discretion in controlling the mode and order of proof at trial" and may choose between "alternative means" in deciding whether to admit co-conspirators' statements. *United States v. Vinson*, 606 F.2d

149, 152-53 (6th Cir. 1979). One method open to the district court is to, "admit the hearsay statements subject to later demonstration of their admissibility by a preponderance of the evidence." *Id.* at 153. Other "acceptable method[s]" include holding a "mini-hearing" at which "the court, without a jury, hears the government's proof of conspiracy and makes the preliminary Enright finding" or requiring the government "to meet its initial burden by producing the non-hearsay evidence of conspiracy first prior to making the Enright finding concerning the hearsay's admissibility." *Vinson*, 606 F.2d at 152-53.

Montgomery argues that the district court should have ordered a pre-trial mini-hearing at which he could have presented evidence or required proof of the conspiracy and its connection to him before admitting the co-conspirator's statements. (Appellant Br. 22.) However, while the district court could have done this, it was also clearly within the district court's discretion under *Vinson* to decide to conditionally admit the hearsay statements subject to a later demonstration of their admissibility by a preponderance of the evidence. This is exactly what the district court chose to do in this case, and it was not an abuse of discretion.

> **2.** **Denial of Montgomery's motion to dismiss Count 1 of the second superceding indictment**

The district court did not err in denying Montgomery's motion to dismiss Count 1 of the second superceding indictment, charging him with conspiracy. The district court's ruling concerning the sufficiency of the indictment is reviewed de novo. *United States v. Carter*, 465 F.3d 658, 662 (6th Cir. 2006). Generally, an indictment is constitutionally adequate if it, "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend,

and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also* FED. R. CRIM. P. 7(c).

The indictment will "usually be sufficient if it states the offense using the words of the statute itself, as long as the statute fully and unambiguously states all the elements of the offense." *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 176 (6th Cir. 1992) (citation omitted). However, the statutory language, "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description with which he is charged." *Id.* Furthermore, "[t]o be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime." *Id.* at 177. But, "an indictment for conspiring to commit an offense" does not need to "allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *Id.* at 176 (quoting *United States v. Reynolds*, 762 F.2d 489, 494 (6th Cir. 1985)).

Count 1 of the second superceding indictment traced the statutory language, which set forth fully, directly, and expressly, without any uncertainty or ambiguity, all the elements necessary to constitute the offence intended to be punished. (R. 74, 1-2.) Furthermore, it provided a general start date and a specific ending date for the conspiracy (and a specific location) and it alleges specific facts which, if proved, would establish a prima facie case for Montgomery's commission of the crime of conspiracy. In particular, the indictment states that "[i]t was a further part of the conspiracy that Margarito Casas would obtain cocaine base, commonly known as crack cocaine, from various

suppliers, including [Montgomery], for distribution to others in the Eastern District of Michigan, including Rubuen Luna and Lee Wiedyk, in turn for further distribution to others," and that "[i]t was a further part of the conspiracy that [Montgomery], Margarito Casas and Rubuen Luna 'cooked' or arranged for others to 'cook' cocaine to covert the cocaine into cocaine base (crack cocaine) for distribution to others." (R. 74 pp. 1-2.) From this information, Montgomery was fairly informed of the charge against which he had to defend and this information would enable him to plead an acquittal or conviction in bar of future prosecutions for the same offense. Consequently, the district court did not err in denying Montgomery's motion to dismiss Count 1 of the second superceding indictment.

### 3. *Consolidation of the drug and witness tampering indictments*

The district court did not err in consolidating the witness tampering and drug conspiracy and distribution charges. Before the district court, the government moved to consolidate under Rules 13 and 8(a) of the Federal Rules of Criminal Procedure, the charges in Case No. 04-20046 (the drug conspiracy and distribution charges) with those in 06-20544 (the witness tampering charges). Rule 13 states that: "[t]he court may order that separate cases be tried together as though brought in a single indictment or information if all offenses and all defendants could have been joined in a single indictment or information." FED. R. CRIM. P. 13.

The issue raised by Rule 13, whether the different charges in the two indictments could have been joined against Montgomery in a single case, is determined by Rule 8(a), which permits the joinder of multiple offenses under a single indictment, and states that the "indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are

of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." FED. R. CRIM. P. 8(a). While, "this court has held that Rule 8 should be construed in favor of joinder," a "failure to meet the requirements of this rule constitutes misjoinder as a matter of law." *United States v. Cody*, 498 F.3d 582, 586 (6th Cir. 2007) (quoting *United States v. Chavis*, 296 F.3d 450, 456 (6th Cir. 2002)) ("If the requirements of Rule 8 are not met, 'the district court has no discretion on the question of severance.'"); *United States v. Deitz*, 577 F.3d 672, 691 (6th Cir. 2007) ("Misjoinder [under Rule 8(a)] is a question of law that we review de novo.").

The consolidation of the two indictments here meets the requirements of Rule 8 and of Rule 13 because the offenses charged are connected with or constitute parts of a common scheme or plan. The drug conspiracy and drug distribution offenses were connected with the witness tampering charges because Montgomery sent the letters to Casas to try to get Casas to change his testimony about the underlying drug offenses. Montgomery hoped that, by getting Casas to change his testimony, he could avoid a conviction for the drug offenses. Consequently, the district court did not err in consolidating the drug conspiracy and distribution charges with the witness tampering charges.

### 4. *Denial of relief under Rules 29 and 33*

The trial court properly denied relief under Rules 29 and 33 of the Federal Rules of Criminal Procedure. The district court's denial of a motion for a judgment of acquittal under Rule 29 is reviewed de novo. *United States v. Hines*, 398 F.3d 713, 720 (6th Cir. 2005). A motion for judgment of acquittal challenges the sufficiency of the evidence to support the conviction. *United*

*States v. King*, 169 F.3d 1035, 1038 (6th Cir. 1999). We must determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Landham*, 251 F.3d 1072, 1083 (6th Cir. 2001) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In doing so, all available inferences and credibility issues are resolved in favor of the jury's verdict, *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001), and this court refrains from independently judging the weight of the evidence, *United States v. Wells*, 211 F.3d 988, 1000 (6th Cir. 2000).

A motion for a new trial under Rule 33 is premised on the argument that the jury's verdict was against the manifest weight of the evidence. *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007). This court reviews the district court's denial of a motion for a new trial for clear and manifest abuse of discretion. *United States v. Hernandez*, 227 F.3d 686, 695 (6th Cir. 2000). In considering the weight of the evidence for purposes of adjudicating a motion for a new trial, the district judge may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence. *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir.1998). "Generally, such motions are granted only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict.'" *Hughes*, 505 F.3d at 592-93 (6th Cir. 2007) (quoting *United States v. Turner*, 490 F. Supp. 583, 593 (E.D. Mich. 1979), *aff'd*, 633 F.2d 219 (6th Cir.1980) (unpublished)).

### i. *Drug distribution and conspiracy charges*

The district court did not err in denying Montgomery's motion under Rule 29 for judgment of acquittal and his motion under Rule 33 for a new trial on Count 1, the drug conspiracy charge. Montgomery argues that there was "no agreement" between himself and Casas to sell cocaine and

that they had merely a buyer-seller relationship. (Appellant Br. 30.) However, the evidence showed much more than a simple buyer-seller relationship. Testimony from Casas showed that he had an agreement with Montgomery, which they originally conceived of years earlier while they were both in prison, in which Montgomery would buy the drugs and Casas would find the purchasers. Furthermore, it was Casas' regular practice between 1997 and 2004 to buy cocaine from Montgomery and for Montgomery to sell cocaine to Casas and, during this period, Montgomery sold Casas at least ten kilograms of cocaine powder. Indeed, when Montgomery left the Saginaw area, the evidence showed that he provided another supplier for Casas and that Casas delivered proceeds from his drug sales to Montgomery's girlfriend. Furthermore, the testimony of Lee Wiedyk and the law enforcement agents that arranged for and monitored the two drug transactions in March of 2004, provided further support for Casas' testimony and showed that Montgomery participated directly in one drug sale and accompanied Casas to another.

Montgomery also argues that there was insufficient evidence to show that he participated in Count 8, the drug transaction with Lee Wiedyk on March 22nd. However, testimony from Casas showed that Montgomery provided the crack cocaine used in the transaction and that he was the passenger that accompanied Casas to the Applebee's. The testimony of the law enforcement officers following Casas throughout the transaction supported this. The law enforcement officers followed Casas' white Durango from his residence to Montgomery's residence, where they saw a black man roughly matching Montgomery's description get in the Durango and accompany Casas to the Applebee's. After Casas exchanged the drugs for cash, Casas returned with this black male to

Montgomery's residence. Furthermore, there was expert testimony that, generally, non-participants would not be present in a drug distribution.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of these crimes beyond a reasonable doubt; consequently, it was proper for the district court to deny the Rule 29 motion for a judgment of acquittal on both Count 1 and Count 8. Similarly, this evidence from numerous witnesses weighs heavily in favor of, rather than against, both of these verdicts; consequently, the district court did not abuse its discretion in denying Montgomery's motion for a new trial on Count 1 and Count 8.

### ii. Witness tampering charges

To prosecute someone under 18 U.S.C. § 1512 for corruptly persuading a witness, the government must establish that the defendant, "attempted to (1) corruptly persuade (2) a witness in an official federal proceeding (3) with the intent to influence that witness's testimony." *United States v. Burns*, 298 F.3d 523, 540 (6th Cir. 2002) (citing 18 U.S.C. § 1512). In *Burns*, Burns told witness Walker to falsely say "[y]ou wasn't getting none from me. . . . Me and Antonio Burns just grew up together, we-we play sports together and he don't deal no drugs. I never knew him to deal no drugs. That what you tell them," and "to tell the grand jury that Keene, not Burns, was Walker's source of crack cocaine." *Id.* at 533. In response, "Walker later assured Burns that he had lied to the grand jury as Burns had urged." *Id. Burns* found that Burns corruptly persuaded Walker by urging him "to lie about the basis of their relationship, to deny that Walker knew Burns as a drug dealer, and to disclaim that Burns was Walker's source of crack cocaine." *Id.* at 540.

Here, as in *Burns*, the evidence showed that Montgomery sent letters to Casas urging him to lie about the basis of their relationship, to deny that Casas knew Montgomery as a drug dealer, and to get Casas to disclaim that Montgomery was the source of Casas' cocaine. These letters urged Casas, "to take the stand, and you just say something totally different like I didn't play any role in this case" and similarly to "read through [the transcripts] for me, and see how you can change up your story." (Government Ex. 9A; *see also* Government Exhibit 10A (offering to give Casas or his family "some bread or what" once he was "off the hook" and urging him to let Montgomery's lawyer or private investigator know "that all the information they said in the grand jury indictment is false").) However, Casas' testimony, which was corroborated by the statements of witnesses like Wiedyk and the law enforcement officers investigating the conspiracy, showed that such testimony from Casas would have been false. Thus, to encourage Casas to say that Montgomery did not play any role in this case or that all the information in the grand jury indictment was false, was to encourage him to lie about their relationship (and its basis), to falsely deny that Casas knew Montgomery as a drug dealer, and to get Casas to falsely disclaim Montgomery as the source of Casas' cocaine. Consequently, it was proper for the district court to deny the Rule 29 motion for a judgment of acquittal and the Rule 33 motion for a new trial on the witness tampering charges.

### 5. *Motion for a mistrial based on prosecutorial misconduct*

The district court did not abuse its discretion in denying Montgomery's requests for a mistrial due to statements that the prosecutor made during rebuttal closing argument. We review a denial of a motion for a mistrial under an abuse of discretion standard. *See United States v. Hargrove*, 416 F.3d 486, 491 (6th Cir. 2005). In examining the prosecutor's conduct, we must first "determine

whether a prosecutor's remarks were improper," and, if improper, "whether the impropriety amounts to reversible error." *Id.* at 492-93 (quoting *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994)). If the remarks appear improper, then we determine whether the remarks are flagrant, after considering four factors: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Id.* (quoting *Carroll*, 26 F.3d at 1385). Even if a remark is held not to be flagrant, it may "nevertheless warrant reversal in cases where (1) the proof against the defendant was not overwhelming, (2) opposing counsel objected to the conduct, and (3) the district court failed to give a curative instruction." *Id.*

Montgomery challenges three statements that the prosecutor made in his closing rebuttal. The first two are actually part of one continuous statement.[3] The third statement came shortly

---

[3]The first two remarks were:

[1] That is a phony argument I would submit to you, ladies and gentlemen. I'm not saying that my opponent here has done anything improper, unethical, illegal, or dishonest except in a sense of the intellectual dishonesty of the arguments that have been argued to you here based on reason and common sense.

[2] The arguments that you have heard my opponent make here this morning, ladies and gentlemen, are the arguments that a guilty man's lawyer must make. He argues long and hard about how terrible and unreliable and corrupt the informant witnesses in this case have been. Ladies and gentlemen, again, Agent Halverson did not select these people. The informant witnesses in this case, in effect, were selected by the defendant.

(Trial Tr., Vol. 6, p. 90)

- 14 -

thereafter.[4]  After closing, while the jury was deliberating, Montgomery's counsel moved for a mistrial based on these remarks because they were, "disparaging the defense, specifically indicating that's what the defense would argue when he's representing a guilty plan [sic]." (Trial Tr., Vol. 6, p. 109, lines 16-18.)  The district court judge immediately denied the request and noted that he was "satisfied that the line of argument was consistent with much of the argument that was provided to the jury concerning the fact issues that they need to resolve" and that he did "not believe that the argument crossed the line or in any way departed from fair commentary on the facts by either side." (Trial Tr., Vol. 6, p. 109-110.)

On appeal, Montgomery argues that a mistrial should have been granted because the prosecutor attacked defense counsel's "ethics or integrity." (Appellant Br. 34.)  We have stated that, "a prosecutor should not directly or implicitly impugn the integrity or institutional role of defense counsel." *United States v. Jamieson*, 427 F.3d 394, 414 (6th Cir. 2005) (citation omitted).  However, "[t]he prosecutor is ordinarily entitled to wide latitude in rebuttal argument and may fairly respond to arguments made by defense counsel." *United States v. Wall*, 130 F.3d 739, 745 (6th Cir. 1997) (quoting *Angel v. Overberg*, 682 F.2d 605, 607-08 (6th Cir.1982) (en banc)).

Examining the comments here, it was not an abuse of discretion for the district court to find that the prosecutor's comments during closing did not warrant a mistrial.  The second and the third statements were not improper.  By pointing out in the second statement that the arguments that

---

[4](Trial Tr., Vol. 6, p. 92 ("[3] Now, defense counsel, my opponent here, says in so many words you can't trust what any of these informant accomplices have said. The most damaging one is Margarito Casas, damaging to him. The message is you shouldn't trust or believe that testimony. Don't believe anything that Casas might say.").)

defense counsel made were the arguments, "that a guilty man's lawyer must make," the prosecutor did not improperly disparage the defense counsel's ethics or integrity; instead, he merely replied to the nature and focus of the arguments that defense counsel had made in closing, and noted that the weakness of the facts which necessitated those arguments indicated Montgomery's guilt. The third comment does not seem to be improper in any way, and Montgomery has not explained how it is. Since these remarks were not improper, the district court did not abuse its discretion in denying Montgomery's requests for mistrial as to these remarks.

The first "phony argument" or "intellectually dishonest" statement is a closer call. The prosecutor qualified his statements but, by claiming that defense counsel was dishonest, he did call into question defense counsel's integrity. However, even if this was improper, it was not flagrant. The evidence against the accused was strong and this remark was isolated. In context, it does not appear that it would mislead the jury or prejudice the accused because the remark responded to defense counsel's earlier arguments and emphasized that, since the government was in the middle of an ongoing investigation, it was inaccurate to criticize the law enforcement agents when they did not follow the person that they believed to be Montgomery into the house after the March 22nd drug transaction. Furthermore, while it is not clear whether the "intellectual dishonesty" statement was deliberate or accidental, it seems likely that it was accidental. Weighing these factors, it is clear that these remarks were not flagrant, and do not otherwise warrant reversal; therefore, the district court did not abuse its discretion in denying Montgomery's requests for a mistrial.

> ***6.      Cruel and unusual punishment claim based on statutorily mandated life sentence***

Montgomery concedes that the standard of review for his cruel and unusual punishment claim is plain error. However, Montgomery raised this issue before the district court, and "[a] constitutional challenge to a sentence is a question of law and reviewed de novo." *United States v. Jones*, 569 F.3d 569, 573 (6th Cir. 2009) (quoting *States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000)). Under either standard, Montgomery's statutorily mandated life sentence did not represent cruel and unusual punishment. Montgomery "concede[s] the fact that case law indicates that mandatory life without parole is not cruel and unusual punishment, in drug cases, in the factual basis that has been decided to date." (Appellant Br. 36.) We agree and note that this court has rejected the argument that a mandatory life sentence for certain drug offenders is cruel and unusual punishment. *United States v. Hill*, 30 F.3d 48, 50-51 (6th Cir. 1994); *see also United States v. Caver*, 470 F.3d 220, 247 (6th Cir. 2006). In this case, the imposition of life imprisonment was not cruel and usual punishment. Furthermore, the district court did not need to look to the 18 U.S.C. § 3553(a) factors in imposing the life sentence because the life sentence was mandatory under 21 U.S.C. § 841.

## V. CONCLUSION

Montgomery raised a number of challenges to his convictions and sentence, however, finding these arguments unpersuasive, we **AFFIRM**.